Emmet, Marvin & Martin, LLP
120 Broadway
New York, New York 10271
Telephone: (212) 238-3000
Facsimile: (212) 238-3100
Edward P. Zujkowski (EZ 3095)
Elizabeth M. Clark (EC 5652)
ezujkowski@emmetmarvin.com
eclark@emmetmarvin.com

Attorneys for The Bank of New York,
Indenture Trustee

Miles & Stockbridge P.C.
10 Light Street
Baltimore, Maryland 21202
Telephone: (410) 385-3464
Facsimile: (410) 385-3700
Paul D. Trinkoff
ptrinkof@milesstockbridge.com


Stevens & Lee P.C.
485 Madison Avenue – 20th Fl.
New York, NY 10022
Telephone: (212) 537-0409
Facsimile: (610) 371-1237
Constantine D. Pourakis (CP 0730)
cp@stevenslee.com

Attorneys for Hillsborough County Aviation
Authority

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------X

| | | |
|---|---|---|
| In re | : | |
| DELTA AIR LINES, INC., et al. | : | Chapter 11 Case |
| Debtors. | : | Case No. 05-17923 (ASH) (Jointly Administered) |

------------------------------------------------------X

| | | |
|---|---|---|
| THE BANK OF NEW YORK, Indenture Trustee | : | |
| and | : | |
| HILLSBOROUGH COUNTY AVIATION AUTHORITY, | : | |
| Plaintiffs, | : | |
| v. | : | Adv. Pro. No. 07-01992(ASH) |
| DELTA AIR LINES, INC., | : | |
| Defendant. | : | |

------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN**
**<u>SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

**TABLE OF CONTENTS**

**PAGE**

TABLE OF AUTHORITIES .......................................................................................................... ii, iii

PRELIMINARY STATEMENT ......................................................................................................... 1

PROCEDURAL HISTORY ................................................................................................................ 2

FACTUAL BACKGROUND .............................................................................................................. 3

    I.      THE AGREEMENT ....................................................................................................... 3

    II.    THE INDENTURE ........................................................................................................ 5

    III.   THE REFINANCING .................................................................................................... 7

ARGUMENT ...................................................................................................................................... 8

    I.      STANDARD FOR SUMMARY JUDGMENT ........................................................... 8

    II.    THE BANKRUPTCY CODE'S LIMITATION ON DAMAGES ONLY APPLIES
          TO "TRUE LEASES" .................................................................................................... 8

    III.   THE AGREEMENT IS A "FINANCING" ............................................................... 10

    IV.   THE PROVISIONS OF THE AGREEMENT PROVIDING FOR BASIC RENT
          CANNOT BE SEVERED FROM THE DEBT SERVICE PAYMENTS .................. 20

    V.    THE FINANCING PROVISIONS OF THE AGREEMENT DOMINATE THE
          GROUND LEASE PROVISIONS. ........................................................................... 20

CONCLUSION ................................................................................................................................. 24

# TABLE OF AUTHORITIES

## FEDERAL CASES

In re Allied Printing, Inc., 344 B.R. 153 (Bkrtcy. M.D. Fla. 2005).............................................17

In re Aspen Impressions, Inc., 94 B.R. 861 (Bkrtcy. E.D. Pa 1989) .........................................17

Celotex Corp. v. Catrell, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).....................8

Citi-Lease Co. v. Entertainment Family Style, Inc, 825 F.2d 1497 (11th Cir 1987)......12, 15, 19

In re Grubbs Const. Co, 319 B.R. 698 (Bkrtcy. M.D. Fla. 2005)....................................16, 17, 19

In re Hispanic American Television Co., Inc., 113 B.R. 453 (Bkrtcy. N.D. Ill. 1990),
    and in Winston, 6 B.R. at 598 .......................................................................................19

In re Hotel Syracuse, Inc., 155 B.R. 824 (Bkrtcy. N.D.N.Y. 1993) .....................9, 10, 11, 14, 15

In re Howell, 161 B.R. 285 (Bkrtcy. N.D. Fla. 1993).................................................................17

International Trade Admin. v. Rensselaer Polytechnic Institute, 936 F.2d 744 (2nd Cir.
    1991) ........................................................................................................10, 14, 18

In re KAR Development Associates, L.P., 180 B.R. 629 (D. Kan. 1995)......................10, 11, 15

In re McCafferty, 96 F.3d 192 (6th Cir. 1996) ...........................................................................8

In re Moreggia & Sons, Inc., 852 F.2d 1179 (9th Cir. 1988) ....................................................11

In re PCH Associates, 804 F.2d 193 (2nd Cir. 1986) ...................................................8, 9, 10. 15

In re Powers, 983 F.2d 88 (7th Cir. 1993) .........................................................................10, 14

In re The Answer-The Elegant Large Size Discounter Inc., 115 B.R. 465 (Bktrcy. S.D.
    N.Y. 1990) ..........................................................................................................17

UAL v. HSBC Bank, 322 B.R. 347 (N.D. Ill. 2005) ..................................................................18

U.S. Bank National Associate v. UAL, 331 B.R. 765 ..............................................................18

In re United Air Lines, Inc., 453 F.3d 463 (7th Cir. 2006)...................................................19, 20

United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609
    (7th Cir. 2005).........................................................................................8, 9, 10, 12, 13

<u>Westship, Inc. v. Trident Shipworks, Inc.</u>, 247 B.R. 856 (M.D. Fla. 2000) ................................9

<u>In re Wingspread Corp.</u>, 116 B.R. 915 (Bkrtcy. S.D.N.Y. 1990) ........................................11, 12

<u>In re Winston Mills, Inc.</u>, 6 B.R. 587 (Bkrtcy. S.D.N.Y.  1980) .........................................10, 12

## STATE CASES

<u>Local No. 234, etc., v. Henley & Beckwith, Inc.</u>, 66 So. 2d 818 (Fla. 1953)............................20

## FEDERAL STATUTES

11 U.S.C. §365 ...................................................................................................................2

11 U.S.C. §502(b)(6) ...................................................................................................2, 3, 7, 24

Fed. R. Civ. P. 56(c) ................................................................................................................8

## STATE STATUTES

 Florida UCC §1.205(35) ........................................................................................................17

## OTHER STATUTES

S.Rep. No. 989, 95th Cong., 2d Sess. 64, reprinted in 1978 U.S.Code Cong. &
   Ad.News 5787, 5850....................................................................................................8

Plaintiffs in the above captioned adversary proceeding (the "Adversary Proceeding") submit this memorandum of law in support of their motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 7056 of the Federal Rules of Bankruptcy Procedure. Accompanying this memorandum of law is a motion, the declaration of Robert D. Lah (the "Lah Declaration") compiling all relevant exhibits, the declaration of Janice Gorgoglione (the "Gorgoglione Declaration") and Local Bankruptcy Rule 7056-1 statement (the "7056-1 Statement") setting forth the material facts as to which there is no genuine issue in dispute.

## PRELIMINARY STATEMENT

The primary issue in dispute in this case is the nature and character of obligations incurred by Delta Air Lines, Inc. ("Delta") in connection with the construction of a hangar and maintenance facility at the Tampa International Airport (the "Project"), and whether the claims arising from those obligations are subject to the limitation on claims of §502(b)(6) of the Bankruptcy Code. Financing for the construction of the Project was obtained from the sale of bonds (except as otherwise identified herein all bonds issued under the Indenture are termed the "Bonds") issued by the Hillsborough County Aviation Authority (the "Authority") under an Indenture dated December 1, 1982 between the Authority and First National Bank of Florida, as supplemented (the "Indenture", Exhibit "A" to the Lah Declaration), and a Lease and Debt Service Agreement with Delta dated December 1, 1982 (the "Agreement", Exhibit "B" to the Lah Declaration) pursuant to which Delta was required to make payments that provided the sole source of cash to pay principal and interest due on the Bonds.

Plaintiffs submit this motion for summary judgment based upon the uncontested facts set forth in Plaintiffs' Rule 7056-1 Statement. These facts clearly establish that the Agreement is, in

economic substance, a financing agreement rather than a "true lease" within the meaning of 11 U.S.C. §365 and that Plaintiffs' claims, arising out of Delta's breach of its obligations under the Agreement, are not subject to the limitations on damages set forth in 11 U.S.C. §502(b)(6).

The Agreement is not a "true lease" despite the fact that it provides for the payment of annual ground rent to the Authority under certain circumstances. The Agreement, taken as a whole, must be deemed a "financing" since the provisions of the Agreement requiring the payment of principal and interest on the Bonds are dominant and have priority over the provisions authorizing the payment of ground rent to the Authority, and the components of the Agreement constitute an integrated unitary agreement that cannot be severed into separate lease and finance transactions.

## PROCEDURAL HISTORY

On September 14, 2005 (the "Petition Date") Delta and certain of its subsidiaries filed a voluntary petition under chapter 11 of title 11 of the Bankruptcy Code with this Court (the "Chapter 11 Case"). On June 29, 2006 a consent order (the "Consent Order", Exhibit "C" to the Lah Declaration) was entered by this Court authorizing the rejection of the Agreement and preserving the rights of Delta and the Plaintiffs with respect to the characterization of all claims relating to the Agreement.

On August 19, 2006 The Bank of New York[1] ("BNY", together with the Authority referred to herein as "Plaintiffs") filed a claim (Exhibit "D" to the Lah Declaration) against Delta in the amount of $8,110,311.11 representing all principal due under the Bonds and interest to the Petition Date. On August 17, 2006 the Authority filed a claim (Exhibit "E" to the Lah

---

[1] BNY is the successor indenture trustee to Barnett Bank and Trust Company, N.A. (formerly known as First Florida Bank, N.A.) under the Indenture.

Declaration) against Delta in the amount of $4,181,735.89 representing unpaid charges due under the Agreement.

On March 28, 2007, BNY and the Authority filed a Statement pursuant to §10.2(d) of Delta's Joint Plan of Reorganization (Exhibit "F" to the Lah Declaration) notifying Delta that they reserved all rights to assert that the Agreement may be deemed a financing obligation and that all claims of BNY and the Authority are not subject to the limitation on damages set forth in 11 U.S.C. §502(b)(6).

On August 20, 2007, BNY and the Authority commenced the Adversary Proceeding (Exhibit "G" to the Lah Declaration) requesting a Declaratory Judgment with respect to the characterization of the Agreement. On September 21, 2007 Delta filed its Answer and Counterclaim (Exhibit "H" to the Lah Declaration) and on October 10, 2007 Plaintiffs filed their Reply to Counterclaim (Exhibit "I" to the Lah Declaration).

## FACTUAL BACKGROUND

The Authority is a body corporate and politic established under Chapter 23339 of the Law of Florida, Acts of 1945, and serves, in part, to provide tax-exempt financing for the maintenance and construction of facilities located at Tampa International Airport. The primary documents executed to provide the tax-exempt financing of the Project are the Agreement and the Indenture.

## I. THE AGREEMENT

The Agreement provides that Delta is responsible for the payment of all Debt Service Payments. See Agreement §5.3. Debt Service Payments are defined as principal, interest and other charges due under the Bonds. See Agreement §§1.1 and 5.3. Delta is required to make all Debt Service Payments directly to BNY and Delta's obligation to make all Debt Service

Payments under the Bonds is unconditional  <u>See</u> Agreement §§5.4 and 5.5.  Delta's obligation to pay the Debt Service Payments survives any default by the Authority under the Agreement, the destruction of the Project or the condemnation of the Project.  <u>See</u> Agreement §§5.5, 11.1, 13.1 and Article IX.  Delta has no right to terminate the Agreement for any reason so long as any principal or interest is outstanding under the Bonds.  <u>See</u> Agreement §§3.3, 15.1.

Delta is obligated to pay all insurance costs, taxes, and maintenance and upkeep of the Project.  <u>See</u> Agreement §§6.1, 6.3, and 8.3.  The Agreement further provides that Delta will indemnify the Authority from all claims and damages relating to the use and occupancy of the Property.  <u>See</u> Agreement, Article IX.

Section 5.2 of the Agreement sets forth a schedule of payments to the Authority ("Basic Rent"), attributable to ground rent under the Agreement.  However, §5.7 provides that all payments made by Delta be applied first to Debt Service Payments and then to the payment of Basic Rent or other amounts due to the Authority under the Agreement.

Articles X and XI of the Agreement provide that if the Project is substantially damaged, destroyed or subject to condemnation, Delta has the option to rebuild or restore the Project.  However, if Delta chooses not to rebuild, then the obligations under the Bonds and the Agreement are accelerated and any proceeds from insurance or any condemnation awards must be used first to pay the principal and interest on the Bonds, prior to any payments to the Authority for Basic Rent or other amounts due the Authority under the Agreement.

The interest payable under the Bonds is intended to be excluded from the income of the holders.  If a "Determination of Taxability" as defined in the Agreement occurs, Delta is required to prepay all Debt Service Payments within ninety (90) days.  <u>See</u> Agreement §13.4.

The Agreement provides that BNY has the right to direct the Authority with respect to the exercise of any remedy under the Agreement. Any amounts collected as a result of the exercise of any remedy by the Authority shall first be paid to BNY to be applied in accordance with the Indenture until all Debt Service Payments have been paid in full, and only then shall such funds be paid to the Authority for payment of amounts, including Basic Rent, due the Authority under the Agreement. See Agreement §14.2.

The Agreement shall terminate on the earlier of January 1, 2024 or 40 years from the completion of the Project. However, the Agreement cannot be terminated if any Bonds are outstanding and the Agreement is automatically extended until all Bonds are paid in full. See Agreement §§1.1, 3.1 and 3.3.

## II.    **THE INDENTURE**

Under Article I, The Granting Clause of the Indenture, the Authority grants to BNY, as security for the payment of the Bonds, an assignment and pledge of the following:

(i)    the right to receive all Debt Service Payments payable under §5.3(a) of the Agreement;

(ii)    all rights to insurance proceeds or condemnation awards payable under Articles X and XI of the Agreement;

(iii)    all revenues payable under §10.10 of the Indenture, as the result of the Authority entering into a new lease for the Project; and

(iv)    all proceeds from the sale or liquidation of the Project.

Article I also provides that the Indenture shall terminate once the Bonds have been paid in full.

Section 8.01 of the Indenture provides that Delta is required to pay <u>directly</u> to the Trustee for deposit of all monies paid pursuant to §5.3(a) of the Agreement (i.e. the Debt Service Payments) and establishes priority of payment for funds received from Delta.

Section 10.01 of the Indenture provides the covenant of the Authority to pay the principal and interest due on the Bonds in accordance with the Agreement. However, notwithstanding any other provision of the Indenture, the Bonds and the interest thereon shall not be deemed to constitute a general debt, liability or obligation of the Authority, Hillsborough County, the State of Florida or any political subdivision thereof, or a pledge of the faith and credit of the Authority, Hillsborough County, the State of Florida or a political subdivision thereof, but the Bonds shall be payable solely from the revenues provided therefor and from the collateral pledged as security therefor, as provided in the Agreement and the Indenture.

Section 10.03 of the Indenture provides that the Authority will perform such acts and execute documents reasonably required to enhance the pledge of the Debt Service Payments to BNY, and pursuant to §10.05 of the Indenture, the Authority agrees to follow the direction of BNY with respect to the enforcement of all rights of the Authority under the Agreement.

Section 10.10 of the Indenture provides that the Authority will not take any action to terminate the Agreement while the Bonds are outstanding. In addition, the Authority covenants that if it takes possession of the Project while the Bonds are outstanding, it will use its best efforts to enter into new leases with respect to the Project and any new rents received by the Authority shall be paid over to BNY to be applied to the outstanding obligations of the Bonds.

Pursuant to the Indenture, the Authority issued $28,000,000 of Hillsborough County Special Purpose Revenue Bonds, Series 1982, dated December 1, 1982 (the "1982 Bonds"). Eight million dollars of the 1982 Bonds accrued interest at the rate of 11% per annum and twenty

million dollars of such Bonds accrued interest at the rate of 11.25% per annum.  See Indenture §3.7.  The 1982 Bonds matured after terms of either twenty or thirty years, after which time the principal amount thereof, accrued interest, and all other amounts due thereunder are required to be paid in a balloon payment.  Id.

## III.     THE REFINANCING

On March 1, 1993 the Authority and the Trustee entered into a Third Supplemental Indenture of Trust (the "Third Supplemental Indenture", Exhibit "J" to the Lah Declaration) which provided for the issuance of $8,000,000.00 of Hillsborough County Aviation Authority Special Purpose Revenue Refinancing Bonds, Series 1993 (the "1993 Bonds").  The proceeds from the sale of the 1993 Bonds were used to retire a corresponding amount of outstanding Bonds.  The 1993 Bonds had a 6.80% annual interest rate and a maturity date of January 1, 2024.  The 1993 Bonds required that interest be paid semi-annually on January 1st and June 30th, and that a balloon principal payment of $8,000,000 be paid on January 1, 2024.

The Authority and Delta also entered into a Second Supplemental Lease and Debt Service Agreement on March 1, 1993 ("Second Supplemental Lease", Exhibit "K" to the Lah Declaration) which incorporated the provisions of the Agreement and required Delta to pay all additional Debt Service Payments in connection with the 1993 Bonds pursuant to the terms and conditions of the Agreement.  In the Second Supplemental Lease, Delta represented that the average maturity of the 1993 Bonds does not exceed 120% of the average reasonably expected remaining economic useful life of the Project.  See Exhibit "K" to the Lah Declaration §2.2(n).

The present principal amount due on the 1993 Bonds is $8,000,000.  The 1993 Bonds are the only Bonds currently outstanding under the Indenture.

## ARGUMENT

## I. STANDARD FOR SUMMARY JUDGMENT

Bankruptcy Rule 7056 provides that Rule 56 of the Federal Rules of Civil Procedure is applicable to Adversary Proceedings filed in Chapter 11 cases. See In re McCafferty 96 F.3d 192, 195 (6th Cir. 1996). Pursuant to Fed. R. Civ. P. 56(c) summary judgment should be granted "when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrell, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).

In this case the application of the undisputed facts to the applicable law supports the Plaintiffs' request for summary judgment.

## II. THE BANKRUPTCY CODE'S LIMITATION ON DAMAGES ONLY APPLIES TO "TRUE LEASES"

It is well established that §502(b)(6) applies only to "true leases" and not to agreements merely labeled as "leases." "The phrase 'lease of real property' does not apply to lease financing transactions or to leases intended as security, but rather applies only to a 'true' or 'bona fide' lease." In re PCH Associates, 804 F.2d 193, 199 (2nd Cir. 1986), citing S.Rep. No. 989, 95th Cong., 2d Sess. 64, reprinted in 1978 U.S.Code Cong. & Ad.News 5787, 5850.

In determining whether an agreement is a financing arrangement or a true lease, the courts have examined both state and federal law. The Second Circuit in PCH, 804 F.2d at 200, examined federal law to reach its conclusion that a sale-leaseback was in fact a disguised financing arrangement, whereas the Seventh Circuit held in United Airlines, Inc. v. HSBC Bank USA, N.A., 416 F.3d 609, 615 (7th Cir. 2005), that state law would be used to determine whether an agreement purporting to be a lease is in fact a true lease, unless state law applied only a formulaic approach, in which case it would conflict with the Bankruptcy Code. Unless state law

elevates form over substance, the <u>United</u> court held that "a state approach that gives a little more or less weight to one of several factors does not conflict with any federal rule." <u>United Airlines, Inc.</u>, 416 F.3d at 615.

In the instant case, whether federal or state law applies is irrelevant because both Florida[2] state courts and federal courts have held that the economic substance of a transaction, rather than the form of the transaction or the fact that the transaction is labeled a lease, should be examined to determine whether a transaction is a true lease or a financing transaction. See <u>PCH</u>, 804 F.2d at 199, <u>Westship, Inc. v. Trident Shipworks, Inc.</u>, 247 B.R. 856, 862 (M.D. Fla. 2000) (examining Florida's Uniform Commercial Code and the legislative history behind §502(b)(6) of the Code and reaching the conclusion that both call for a case-by-case analysis).

The courts have identified several probative factors when determining whether a purported lease is in fact a "true lease" or a disguised financing. No one factor is definitive, and the true nature of a lease must be determined from the facts of the particular transaction to determine "whether the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." <u>In re Hotel Syracuse, Inc.</u>, 155 B.R. 824, 838 (Bkrtcy. N.D.N.Y. 1993). Among those factors held relevant are (i) whether the payments were calculated in relation to the fair market value of the land, or the amount necessary to finance the transaction, (ii) whether payments are the unconditional obligations of the lessee, (iii) whether the payment provisions contain a "balloon" payment at the end of the lease, (iv) whether the lessee may terminate the lease, (v) whether the lessee assumed many of the obligations normally associated with ownership, such as payment of taxes and insurance, (vi) whether the transaction was structured as a lease to secure certain tax advantages,

---

[2] Section 27.2 of the Agreement provides that the Agreement is governed by the laws of the State of Florida.

and (vii) whether there is a meaningful reversionary interest to the lessor.  Also, a nominal purchase price at the end of the lease term has been held to be relevant.  See e.g., Id., International Trade Admin. v. Rensselaer Polytechnic Institute, 936 F.2d 744, 748 (2nd Cir. 1991),  PCH, 804 F.2d at 200, United Airlines, Inc., 416 F.3d at 615, In re KAR Development Associates, L.P., 180 B.R. 629, 639 (D. Kan. 1995), In re Powers,  983 F.2d 88 at 90 (7th Cir. 1993).

## III.  THE AGREEMENT IS A "FINANCING"

The following  factors establish that the Agreement is not a "true lease":

### a.  The "Debt Service Payments" were not calculated to compensate the landlord for the use of the land, but to finance the transaction.

The amount of the "Debt Service Payments" is not related to the value of the facilities used, but rather each payment is specifically calculated as an amount sufficient to pay the interest and principal due on the Bonds, plus expenses of the Trustee and the Authority.

In §5.3 of the Agreement, Delta agreed to pay the Debt Service Payments, which are an amount equal to the interest, principal and sinking fund payments due with respect to the Bonds and the expenses of the Trustee and any expenses of the Authority in connection with the issuance of the Bonds.  See Agreement §5.3(a).  Delta's payments of principal and interest are due the day before the interest or principal payment, as applicable, is due to the holders of the Bonds.  See Agreement §5.3(a).  Under §5.4 of the Agreement, Delta makes its payments directly to the Trustee, and such payments are then sent from the Trustee to the holders of the Bonds (other than funds for payment of expenses).  The Authority, the purported "landlord," never receives the Debt Service Payments.

Numerous courts have determined that the fact that purported rental payments are "carefully keyed to principal and interest payments due on the bonds" is indicative of a

financing, and not a true lease. <u>In re Winston Mills, Inc.</u>, 6 B.R. 587, 593 (Bkrtcy. S.D.N.Y. 1980), see also <u>KAR Development Associates, L.P.</u>, 180 B.R. at 639 (found to be a financing where "lease payments are not related to rental value, but rather are calculated to retire the bond debt"), <u>In re Hotel Syracuse, Inc.</u>, 155 B.R. at 839 (found to be a financing where rental payments were $1 plus costs in connection with the use and occupation of the premises, including mortgage payments thereon), <u>In re Wingspread Corp.</u>, 116 B.R. 915, 923 (Bkrtcy. S.D.N.Y. 1990) (finding a financing transaction where "the rental payments are absolute obligations, tied to the principal and interest on the bonds and timed to coincide with their payment"), <u>In re Moreggia & Sons, Inc.</u>, 852 F.2d 1179, 1184 (9th Cir. 1988) (finding a financing transaction where payment obligations other than maintenance expired when the bonds issued in connection therewith were retired). In the present case, there is a direct connection between the amount of the Debt Service Payments due under the Agreement and the payments due on the Bonds. This is a strong factor for supporting the finding that the Agreement is a financing.

     **b.**  <u>**Delta's obligations for Debt Service Payments are unconditional**</u>**.**

   Section 5.5 of the Agreement provides that Delta, until the principal and interest on the Bonds and other expenses incurred in connection with the Bonds have been paid in full, (a) will not suspend or discontinue any Debt Service Payments, (b) will perform all of its obligations under the Agreement, and (c) will not terminate the Agreement prior to the term of the Agreement. Delta's obligations exist unconditionally, even if Delta's right to use and occupy the Lease Premises is terminated or Delta is otherwise dispossessed from the property, or if Delta sells its interest to another party. <u>See</u> Agreement §16.1(a). In fact, Delta must continue to make payments regardless of "any other circumstance, happening or event whatsoever, whether foreseeable or unforeseeable, and whether similar or dissimilar to the [listed events], it being the

intention of the parties [to the Agreement] that all amounts payable by Delta in respect of [the Agreement] shall continue to be payable in all events in the manner and at the time [provided in the Agreement]."  See Agreement §5.5(k).

These provisions are commonly known as a "hell or high water" clause, and are common in transactions in which the principal reason for payments is to retire a debt, rather than to reflect the economic value of the underlying asset.  Several courts have discussed the significance of such clauses in the municipal bond context.  Recently, the Seventh Circuit held in United Airlines, Inc., 416 F.3d at 617, that "the hell or high water clause demonstrates the lack of connection between the maintenance base's rental value and [the tenant's] financial obligation." In re Wingspread Corp., 116 B.R. 915 at 923,  also contained a "hell or high water" provision where "the rental obligations do not cease if the projects are destroyed or seized by eminent domain, but terminate when the bonds are retired."  The Court cited this as a factor in concluding that the transaction was a "financing."  In Winston, one of the factors that the court considered in determining that a purported lease was a financing transaction was the fact that the purported lessee was required to purchase the leased premises "in the event of condemnation, casualty or change in circumstances (e.g. tax status of the bonds) for an amount equal to 'All Unpaid Installments of Rent.'"  Winston, 6 B.R. at 594.

Courts that have determined whether or not  a lease is a "true lease" in contexts other than municipal financings have also held the presence of the "hell or high water" provision to be determinative.  In Citi-Lease Co. v. Entertainment Family Style, Inc, 825 F. 2d 1497 (11th Cir 1987), the Eleventh Circuit held that one of the factors for disregarding the label of "lease" was the fact that the lessee was required "to bear the risk of loss yet remain beholden for any outstanding rent."  Citi-Lease, 825 F.2d at 1500.  A "hell or high water" provision is simply

inconsistent with the obligations of a tenant under a true lease, where rent is paid in exchange for a current benefit received by the tenant in the form of the possession and use of the leased premises. See United Airlines, Inc., 416 F.3rd at 613 (rent which represents the cost of funds for capital assets rather than ongoing inputs into production "has the quality of debt").

Both the amount of the Debt Service Payments and the fact that the obligation to make such payments is absolute indicate that the amount of such payments is completely unrelated to the rental value of the Project. Rather, Delta needed a maintenance base and hangar, the Authority was willing to issue Bonds to finance its construction, and Delta agreed to repay such Bonds. To argue that the fair rental value of the Project was coincidentally identical to the payment of the Bonds would be disingenuous.[3]

### c.      The Debt Service Payments call for a balloon payment.

As discussed above, the Bonds are and have always evidenced term debt obligations, for which Delta was required to make periodic interest only payments and then satisfy the Bonds in full by making a lump sum balloon payment at maturity. Currently, the only Bonds that are outstanding are the 1993 Bonds, which require interest only payments until January 1, 2024, and a balloon payment of $8,000,000 at such time. Therefore, the Debt Service Payments under the Agreement will be interest only until January 1, 2024. In United Airlines, Inc., the court used the presence of a balloon payment as a factor for finding a finance transaction. The court held that "the balloon payment has no parallel in a true lease, although it is a common feature of secured credit." United Airlines, Inc., 416 F.3d at 617. The same is true of the Agreement.

---

[3] These "hell or high water" provisions should be contrasted with the provision in the Agreement for payment of "Basic Rent." The "Basic Rent" (set forth in section 5.2 of the Agreement), is based on the amount of land actually occupied by Delta. Furthermore, in the event of damage or destruction of the Project, all Debt Service Payments are accelerated and immediately due and payable from Delta, whereas Delta is released from all other unaccrued obligations, including the obligation to pay Basic Rent.

### d. Delta may not terminate the Agreement while the Bonds are outstanding.

Another characteristic distinguishing leases from financing transactions is the ability of the lessee to terminate the lease before the expiration of its term. See <u>In re Powers</u>, 983 F.2d at 90 (holding that the ability to terminate a lease is indicative of a lease). In fact, Florida Statute 671.201(35), Florida's Uniform Commercial Code, uses terminability of a lease by a lessee as being a threshold matter when distinguishing a lease from a security agreement.

In the present case, §3.3 of the Agreement prohibits Delta from terminating the Agreement under virtually every circumstance. This factor is clearly contrary to Delta's argument that the Agreement constitutes a "true lease."

### e. The Lessee is responsible for the burdens of ownership.

In <u>United Airlines, Inc.</u>, as well as <u>Winston</u>, <u>Wingspread</u>, <u>Hotel Syracuse</u>, <u>PCH</u> and virtually all of the cases that have examined the issue and determined that a financing was present instead of a true lease, the lessee was responsible for meeting all of the burdens of ownership, including paying for maintenance, taxes and insurance on the premises.

Although courts have cautioned against putting too much stock in these provisions (see <u>Hotel Syracuse</u>, 155 B.R. at 840, and <u>Rensselaer Polytechnic Institute</u>, 936 F.2d at 751) because of the prevalence of triple net leases, which impose many of the same obligations on lessees, the existence of such provisions remains an indication of a financing transaction. As would be expected from a financing transaction such as the Agreement, these burdens are exclusively the obligation of Delta (<u>See</u> Agreement §§5.6, 6.1, 6.2 and 6.3).

Furthermore, Delta agreed in the Agreement to indemnify the Authority against any claims related to the leasing, use or occupancy of the Project, and to assume any liability for all injuries, claims and damages related to the Project, unless caused by the Authority's negligence

or willful acts or omissions.  <u>See</u> Agreement, Article IX.  In <u>Citi-Lease</u>, 825 F.2d at 1500, the court found the obligation of the lessee to indemnify the lessor to be another burden of ownership that was relevant for determining the nature of the transaction.

Another typical incident of ownership is the ability to sell the Project.  Delta's rights to assign its interest in the Project are set forth in Article XVI of the Agreement.  Section 16.1 provides that "this Agreement may be assigned in whole or in part, and Delta's interest in the [Project] may be sold or leased as a whole or in part, by Delta without the necessity of obtaining the consent of the Authority" subject to certain conditions (among them, a right of first refusal to the Authority to purchase the interest).  True commercial leases customarily provide that a lessee must, at a minimum, seek a landlord's consent to any assignment.  No such consent is required under the Agreement.

Also, the precise language chosen by the parties in this §16.1 is telling.  Even though the document is partially titled a "Lease" the language of this section implies that Delta, not the Authority, is the true owner of the improvements to the Project.  Delta is given the right to "<u>sell or lease</u>" its interest in the Project, not assign or sublease.  In fact, the parties took care to distinguish between the Agreement, which would be "assigned" and the Project, which would be "sold."  Finally, by giving the Authority the right, in effect, to purchase the Project from Delta, §16.1 strongly suggests that the Authority maintains a status that is other than a true landlord.  In a "true lease" a landlord need not purchase the leased property that it already owns.

<b>f.        Structure of the Agreement was designed to provide tax benefits.</b>

Several courts have held that where one of the principal reasons for a transaction is to achieve the tax benefits incident to a lease rather than a sale, the transaction will be found to be a financing transaction.  See <u>PCH</u>, 804 F.2d at 200, <u>Hotel Syracuse</u>, 155 B.R. at 838, <u>KAR</u>

Development Associates, L.P., 180 B.R. at 639, each of which use the fact that the transaction was structured for tax benefit as a factor in holding a transaction not to be a true lease.

Section 13.4 of the Agreement requires Delta to prepay all of the Debt Service Payments upon a determination that the Bonds would no longer be tax-exempt. This is evidence that the parties structured the transaction as they did to provide a tax benefit. Additionally, each of the First, Second and Third Supplemental Lease and Debt Service Agreements contain a special tax covenant whereby the Authority and the Company covenant to maintain the tax exempt status of the Bonds. Clearer evidence of the tax purpose behind the transaction is difficult to imagine.

g. **The Authority has no meaningful reversionary interest in the Project.**

In In re Grubbs Const. Co, 319 B.R. 698, 711, (Bkrtcy. M.D. Fla. 2005) a bankruptcy court found that §1-201(35) of Florida's Uniform Commercial Code (which deals solely with leases of personal property) adopts the "economic realities" test when distinguishing between leases and financing transactions, implying that cases applying the UCC are relevant in other cases in which the "economic realities" test is applied. As stated in Grubbs, Florida's Uniform Commercial Code contains a "safe harbor" to be used when determining whether a lease is in fact a secured financing. When a transaction falls within the "safe harbor" it is per se a financing transaction. However, when an agreement does not fall clearly within the safe harbor, it is not automatically a true lease, but rather the court must then use the economic realities test to determine the true nature of the agreement.

In the present case, the Agreement falls within the statute's safe harbor definition of a financing because it is not terminable by the lessee and the original term of the lease is equal to or greater than the "remaining economic life" of the leased property. The fact that the Florida

legislature has identified the <u>economic</u> life of the facility is significant and, in this case, determinative.

Similar to the "economic life" factor specified in the UCC, several cases have held that where there is no <u>meaningful</u> reversionary interest to the purported lessor, a transaction will be considered a financing transaction. For example, the court in <u>Grubbs</u> found that "the central feature of a true lease is the reversion of an economically meaningful interest to the lessor at the end of the lease term." <u>Grubbs</u>, 319 B.R. at 714. Whether the residual interest is economically meaningful or not is to be determined by the expectations of the parties when the lease was entered into. <u>Id.</u>

In other cases applying the UCC, the courts determined that the lessor's reversion must be economically valuable for the transaction to qualify as a lease. See <u>In re Allied Printing, Inc.</u>, 344 B.R. 153, 157 (Bkrtcy. M.D. Fla. 2005) (found to be a lease where the economic life of goods was eight years and the lease term was four years), <u>In re Howell</u>, 161 B.R. 285, 290 (Bkrtcy. N.D. Fla. 1993) (found to be financing because lease runs for the property's "remaining useful life"), <u>In re Aspen Impressions, Inc.</u>, 94 B.R. 861, 866 (Bkrtcy. E.D. Pa 1989)("the salient factor, then, is the relationship of the amount paid towards the equipment over the life of the agreement to the property's fair market value at the end of the lease"), <u>In re The Answer-The Elegant Large Size Discounter Inc.</u>, 115 B.R. 465, 469 (Bktrcy. S.D. N.Y. 1990) ("where the property or equipment in question has substantially reduced value at the end of the contract term, especially where the property is custom designed for the specific needs of the user so that any reversionary interest claimed by the financing party is significantly less at the end of the contract term, the document will be more indicative of a security interest rather than a 'true lease'"). In short, the fact that a building may still exist on a piece of land when the lease expires is not

determinative. The court must determine what utility the parties believed the building would have at such time. <u>Rensselaer Polytechnic Institute</u>, 936 F.2d at 751.

In the present case, the parties anticipated that the Project would have a useful life of no more than the term of the Lease. The Second Supplemental Lease contains a representation by the Delta that "the average maturity of the 1993 Bonds does not exceed one hundred twenty percent (120%) of the average reasonably expected remaining economic useful life of the" Project. <u>See</u> Exhibit "K" to Lah Declaration, §2.2(n). This language is indicative of the Authority's (and the Bondholders') concern that the Project's useful life was significantly <u>less</u> than the payment term for the Bonds, and so elicited from Delta its agreement to limit the gap between the expiration of the Project's useful life and the term of the Agreement. It should be noted that the Authority did not ask for a representation that there will be a meaningful reversion to the Authority, or that, at the time, the estimated useful life exceeded the term of the Agreement, but rather sought to enhance the possibility that the Project would not become economically worthless too far in advance of the scheduled maturity of the Bonds. This provision in the Second Supplemental Lease clearly indicates that the parties anticipated in 1993 that there would not be any economically meaningful reversion to the Authority at the end of the Agreement, or, at a minimum, that any residual value to the Authority was not a material consideration.[4]

---

[4] The provision in their Agreement that the Second Supplemental Lease stands in strong contrast to those cases which the parties specified that the lease property would have economic utility at the end of the term. <u>U.S. Bank National Assoc. v. UAL</u>, 331 BR 765, 769; <u>UAL v. HSBC Bank</u>, 322 BR 347, 349 (N.D. Ill. 2005).

### h. **Option to purchase not determinative.**

Many courts, in applying the "economic realities" test have looked to the presence or absence of a purchase option. However, the lack of an option to purchase has repeatedly been found not to be controlling. Grubbs, 319 B.R. at 719.

Courts have found transactions to be financing arrangements in many instances where there is no purchase option. In Citi-Lease, 825 F.2d at 1500, the court noted that even though no evidence was introduced regarding the useful life of the products being leased, a purported lease was in fact a financing transaction because all of the other factors were present, and the lease payments exceed the purchase price of the products. The court interpreted that fact as indicating that the payments represented principal plus interest payments. Considering that the Debt Service Payments are designed to repay the Bonds, it can hardly be argued that they do not represent, in fact, a return of principal and interest. The Second Circuit, in Rensselaer Polytechnic Institute, also found that a purchase option was not necessary when the other indicia of a security arrangement were present. Rensselaer Polytechnic Institute, 936 F.2d at 751. The same conclusion was reached in In re Hispanic American Television Co., Inc., 113 B.R. 453, 462 (Bkrtcy. N.D. Ill. 1990) (finding that "where the term of the lease, as intended by the parties is substantially equal to the life of the leased property such that there will be nothing of a meaningful value to return at the end of the lease, the transaction is in essence a sale"), and in Winston, 6 B.R. at 598 ("the existence of the option in and of itself is not determinative of whether the lease was intended as security"). As discussed above, the reversionary interest to the Authority will not be meaningful.

## IV. THE PROVISIONS OF THE AGREEMENT PROVIDING FOR BASIC RENT CANNOT BE SEVERED FROM THE DEBT SERVICE PAYMENTS

The Seventh Circuit in In re United Air Lines, Inc., 453 F.3d 463 (7th Cir. 2006), held that state law must be applied to determine if provisions in the same agreement providing for the payment of ground rent and debt service on bonds can be severed. Applying Colorado law, the Seventh Court determined that the provisions were not severable.

The application of Florida law would produce the same result. In determining whether an agreement may be severed, Florida courts examine whether the parties have intended that multiple arrangements contained in the same document be enforceable independently. Courts have held that "a contract is indivisible where the entire fulfillment of the contract is contemplated by the parties as the basis of the arrangement." Local No. 234, etc., v. Henley & Beckwith, Inc., 66 So.2d 818, 822 (Fla. 1953). In this case the provisions to pay Basic Rent cannot be severed from the provisions to make Debt Service Payments. The Agreement contemplates an integrated financial transaction to provide financing to construct the Project and tax exempt income to the holders of the Bonds. The provisions in the Agreement which provide consideration to both the Authority and the holders of the Bonds are clearly interrelated and there is no indication that the parties contemplated that these provisions could exist independent of each other.

## V. THE FINANCING PROVISIONS OF THE AGREEMENT DOMINATE THE GROUND LEASE PROVISIONS.

The Seventh Circuit in United Air Lines, Inc., faced with the situation where provisions for payment of ground rent and debt service payments were contained in one agreement, found that the agreement was a "true lease" because the ground lease provisions were clearly dominant. The Court noted that the "facilities provisions" standing on their own may have constituted a

"stealth financing arrangement" but this argument was moot since the financing provisions of the agreement could not be severed from the provision providing for the payment of ground rent and the ground lease provisions dominated the agreement's "subordinate facilities provisions" <u>United Air Lines, Inc.</u>, 453 F.3d at 471.

The facts in our case produce the opposite result.   The financing provisions of the Agreement clearly dominate the ground lease terms.   Payment of the principal and interest due on the Bonds has a clear priority over the payment of Basic Rent to the Authority.   Section 5.7 of the Agreement provides that "all payments made by Delta hereunder shall be applied first to the payment of Debt Service Payments due hereunder and then to the payment of Periodic Payments."   (Basic Rent is included in the definition of Periodic Payments).   The priority of Debt Service Payments over the payment of Basic Rent is a common theme throughout the Agreement.   Article X of the Agreement provides that in the event that Delta chooses not to restore the Project after a casualty, insurance proceeds will be utilized first to make Debt Service Payments prior to the payment of Basic Rent.   Also §11.1 of the Agreement establishes a similar priority for Debt Service Payments with respect to the use of condemnation proceeds.   Finally, §14.2 of the Agreement provides that upon the occurrence of an Event of Default:

> "Any amounts collected pursuant to action taken under this section, after subtracting all costs and expenses and other deductions herein contemplated, shall first be paid into the Sinking Fund and applied in accordance with the provisions of the Indenture, until all Debt Service Payments have been paid in full, and shall thereafter be paid to the Authority to satisfy all payments due it hereunder . . . . . . "

The Indenture also reflects the priority of the payment of the Bonds.   In the event that the Authority takes possession of the Project upon the occurrence of a default by Delta under the Agreement, any funds which the Authority receives from the re-leasing of the Project must first be applied to outstanding Debt Service Payments.   <u>See</u> Indenture §10.10.

Under the Agreement the right of the Authority to receive payments of ground rent constitutes additional security for payment of the Bonds and the Authority cannot receive payments of Basic Rent and operating costs while there are unpaid Debt Service Payments. Thus, with respect to the concept of payment, a primary term of the Agreement, the payment of the Bonds have a clear, contractual priority over the payment of Basic Rent to the Authority.

Other provisions of the Agreement demonstrate the dominance of the financing provisions over the ground lease. Delta's obligation to make Debt Service payments is unconditional. Section 3.3 provides that the Agreement may not be terminated while the Bonds are outstanding. In fact, §5.1 of the Agreement provides that the term of the Agreement must be extended until all Debt Service Payments have been paid in full. There are no corresponding provisions in the Agreement which make the payment of Basic Rent to the Authority unconditional. In fact, the Agreement may be terminated by Delta in certain circumstances upon the payment of all Debt Service Payments, regardless of whether all Basic Rent has been paid. See Agreement §15.1.

The remedial provisions of the Agreement also elevate the rights of the holders of the Bonds over the rights of the Authority. For example, the Authority has no independent right to take any remedial action of its own without the consent and or direction of the holders of the Bonds and all monies recovered as a result of such remedial action must be first applied to amounts due under the Bonds. See Agreement §14.2. Similarly, the Indenture seeks to provide special protection to the holders of the Bonds when in §10.10, it requires the Authority to "use its best efforts" to re-lease the Project with the resulting rents to be first used to satisfy the required Debt Service Payments.

The fact that the Agreement contains additional protections favoring the interest of the holders of the Bonds should not be surprising given the basic economics of the Agreement. Under the Agreement the amount of Basic Rent to be paid to the Authority pales when compared to the amount of the Debt Service Payments. For example, just for the period from June 1993 through June 2006, Delta has paid aggregate Debt Service Payments of $17,481,000. <u>See</u> Delta Schedule of Payments, Exhibit "L" to the Lah Declaration. In addition, under the terms of the initial Bonds, Delta was required to pay Debt Service Payments of at least $30,000,000[5] from 1982 through 1993, yielding total Debt Service Payments in excess of $47,000,000. By contrast, since the inception of the Agreement, Delta has made payments of Ground Rents to the Authority in the amount of $3,093,818.48. See Exhibit "A" to Gorgoglione Declaration.

---

[5] Annual Debt Service Payments for the 1982 Bonds were as follows:

$8,000,000 at 11.1%     = $   880,000
$20,000,000 at 11.25% = <u>$2,250,000</u>
                                   $3,130,000

Thus, from the beginning of 1983 through the issuance of the 1993 Bonds (10 years) Delta was required to make at least $30,000,000 of Debt Service Payments.

## CONCLUSION

Based upon the facts and applicable law set forth herein it is clear that provisions in the Agreement relating to the Debt Service Payments are in the nature of a financing and that those provisions dominate and have priority over those provisions of the Agreement providing for the payment of ground rent to the Authority. The separate provisions of the Agreement cannot be considered independently and, taken as a whole, the Agreement is a Financing and does not constitute a "true lease". Thus, the claims of BNY and the Authority are not subject to the limitations imposed by 11 U.S.C. §502(b)(6) and must be allowed in full.

Dated: New York, New York
      January 28, 2008

          **THE BANK OF NEW YORK**
           Indenture Trustee

          By: /s/ Edward P. Zujkowski
              Edward P. Zujkowski (EZ 3095)
              Elizabeth M. Clark (EC 5652)

          Emmet, Marvin & Martin, LLP
          120 Broadway
          New York, New York 10271
          (212) 238-3000 (Telephone)
          (212) 238-3100 (Facsimile)

          and

          **HILLSBOROUGH COUNTY AVIATION AUTHORITY**

          By: /s/ Constantine D. Pourakis
              Constantine D. Pourakis (CP 0730)

          STEVENS & LEE P.C.
          485 Madison Avenue – 20th Fl.
          New York, New York 10022
          (212) 537-0409 (Telephone)
          (610) 371-1237 (Facsimile)

MILES & STOCKBRIDGE P.C.
Paul D. Trinkoff
10 Light Street
Baltimore, Maryland 21200
(410) 385-3464 (Telephone)
(410) 385-3700 (Facsimile)

and

HILLSBOROUGH COUNTY AVIATION
AUTHORITY
Gigi Skipper Rechel, General Counsel
Tampa International Airport
P.O. Box 22287
Tampa, Florida 33622
(813) 870-8771 (Telephone)
(813) 875-6670 (Facsimile)